UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jesus Barrera, Loida Nohemi Cruz, Juan
Morales Gomez, Rogelio Hernandez, Jose
Pedro Lira, Mario Martinez, Paul Martinez,
Jose Angel Juarez Mendez, Miguel A. Miranda,
and Rosa Sagastume,

       Plaintiffs,

v.

United States Department of Homeland Security,
Michael Chertoff, United States Division of
Immigration and Customs Enforcement, Julie L.
Myers, John P. Torres, Scott Baniecke, Kenneth
Baird, Thomas M. Boyle, Craig Scherer, Tracy
Warner, Jessica Begres, and John Doe ICE Agents
Nos. 1-100,

       Defendants.

Civil No. 07-3879 (JNE/SRN)
ORDER

---

Dan R. Shulman, Esq., and Prairie A. Bly, Esq., Gray, Plant, Mooty, Mooty & Bennett, P.A., and
Gloria C. Edin, Esq., and Rachel E. Bengston, Esq., Centro Legal, Inc., appeared for Plaintiffs
Jesus Barrera, Loida Nohemi Cruz, Juan Morales Gomez, Rogelio Hernandez, Jose Pedro Lira,
Mario Martinez, Paul Martinez, Jose Angel Juarez Mendez, Miguel A. Miranda, and Rosa
Sagastume.

Lonnie F. Bryan, Esq., Assistant United States Attorney, Office of the United States Attorney for
the District of Minnesota, appeared for Defendants United States Department of Homeland
Security, Michael Chertoff, United States Division of Immigration and Customs Enforcement,
Julie L. Myers, John P. Torres, Scott Baniecke, Kenneth Baird, Thomas M. Boyle, Craig
Scherer, Tracy Warner, Jessica Begres, and John Doe ICE Agents Nos. 1-100.

---

     Plaintiffs Jesus Barrera, Loida Nohemi Cruz, Juan Morales Gomez, Rogelio Hernandez,

Jose Pedro Lira, Mario Martinez, Paul Martinez, Jose Angel Juarez Mendez, Miguel A. Miranda,

and Rosa Sagastume bring this action against the United States Department of Homeland

Security (DHS), United States Immigration and Customs Enforcement (ICE), and various

individuals employed by DHS and ICE, including both individual ICE special agents and

officials with broader policymaking and managerial authority.  Plaintiffs allege violations of rights guaranteed by the Fourth, Fifth, and Sixth Amendments to the United States Constitution, *see Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), as well as violations of the Immigration and Nationality Act, and they seek monetary, declaratory, and injunctive relief.  The case is before the Court on Defendants' motion to dismiss or, in the alternative, for summary judgment.  Because the Court considers matters outside the pleadings, the Court treats Defendants' motion as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d).  For the reasons discussed below, the Court grants the motion.

## I.      BACKGROUND

Plaintiffs are Latinos who are United States citizens or are otherwise authorized to reside and work in the United States.  Plaintiffs are or were employed by Swift & Company at its meat processing plant in Worthington, Minnesota.

On December 12, 2006, ICE agents searched Swift's Worthington plant pursuant to a warrant.  The warrant granted ICE agents authority to enter the Worthington plant and "make such search as is necessary to locate" illegal aliens and certain fraudulent documents.  The search of the Worthington plant was part of "Operation Wagon Train," a ten-month investigation into alleged use and distribution of fraudulent identity documents by Swift employees that resulted in searches of Swift plants in six states.

The Complaint alleges that, during the search of the Worthington plant, the following occurred:

> [T]he ICE agents involved arrested the plaintiffs without probable cause, unlawfully confined plaintiffs against their will at the Swift plant, subjected the plaintiffs to searches and interrogations without advising them of their constitutional rights, used racial epithets directed at the plaintiffs and others of Latin descent, and otherwise insulted, abused, and humiliated the plaintiffs on account of their race.

More specifically, the Complaint states that Plaintiffs and others were "rounded up and herded by ICE agents into designated interrogation areas within the Swift plant" under circumstances that caused Plaintiffs to believe they were not free to leave, that Defendants searched Plaintiffs' worksite lockers and personal belongings without Plaintiffs' consent or a warrant authorizing such searches, that Defendants denied plant access to attorneys retained by Plaintiffs' union, and that "Defendants ordered a number of female employees to disrobe in front of ICE agents, and ordered other plaintiffs to keep bathroom doors open so that they could be watched while using the toilet." Plaintiffs' Caucasian co-workers were allegedly exempted from such treatment.

Plaintiffs' affidavits give a more detailed picture of the search of the Worthington plant and of the conduct of which Plaintiffs complain.[1] These affidavits state that the search was conducted by a large number of ICE agents who carried guns and wore jackets printed with the words "ICE" or "POLICE." Some agents were stationed at the plant's exits while others moved throughout the plant to conduct the search over the course of about six to eight hours.

According to their affidavits, Plaintiffs were directed by either ICE agents or Swift supervisors to a cafeteria within the plant where Plaintiffs and other workers were questioned about their immigration statuses by ICE agents.[2] Plaintiffs all pointedly state that they were not informed of their rights to remain silent or to consult with attorneys. Many Plaintiffs claim that their answers to ICE agents' questions were not immediately accepted as true and that agents

---

[1] Plaintiffs' initial response to Defendants' motion included affidavits from Plaintiffs Barrera, Cruz, Lira, and Mario Martinez. The Court granted Plaintiffs leave to supplement the record with the affidavits of Gomez, Hernandez, Paul Martinez, Mendez, Miranda, and Sagastume.

[2] The affidavits of Lira and Mario Martinez state that they were questioned by ICE agents, but they do not specifically indicate that Lira and Mario Martinez were directed to the cafeteria.

persisted in testing the veracity of Plaintiffs' answers with additional questions.  Cruz, Gomez,

Mario Martinez, and Sagastume indicate that Caucasian workers and workers fluent in English

were exempted from questioning or were otherwise given preferential treatment.  Many Plaintiffs

claim that ICE agents were pushy, inconsiderate, or rude.  Barrera's affidavit states that an ICE

agent called Barrera a "wetback" and told Barrera he would send Barrera to Mexico, and

Mendez's affidavit states that ICE agents mocked him because he did not speak fluent English.

Plaintiffs' affidavits indicate that ICE agents determined, after questioning, that six

Plaintiffs were not targets of the search.  Barrera, Lira, Mario Martinez, and Paul Martinez

informed the questioning agents that they were United States citizens.  Gomez provided

documentation to the questioning agents and truthfully indicated that he was an asylum resident

who was working legally.  Sagastume, who apparently was a legal resident, was escorted to her

locker, where she showed ICE agents her "card," and ICE agents then searched through her

possessions and returned them to her.  After questioning, Barrera, Gomez, Mario Martinez, Paul

Martinez, and Sagastume were directed to a room or rooms where they were required to wait,

along with other individuals of all races who were not being formally arrested, for up to two

hours before being permitted to return to work.  None of these individuals were handcuffed, and,

according to Gomez and Mario Martinez, even Caucasian employees who were exempted from

questioning were required to wait in this manner.  Lira was not required to wait with the rest of

the individuals who were not being arrested, though he was not allowed access to the cafeteria or

to individuals who had been formally arrested.

The four remaining Plaintiffs were detained under more restrictive conditions.  According

to their affidavits, Cruz, Hernandez, Mendez, and Miranda truthfully stated that they were legal

residents and were arrested after they further revealed that they did not have certain required

documentation in their possession.  They were separately escorted to their lockers, where Cruz,

Mendez, and Miranda were either permitted or required to change out of their work clothes.

Cruz's and Miranda's personal items were placed in bags, and Miranda's possessions were

examined and returned.  All four of these Plaintiffs were permitted to use the bathroom, though

in each case ICE agents required that the stall or bathroom door be left open.  These four

Plaintiffs were then handcuffed and detained under guard in a room or rooms with other

individuals suspected of being illegal aliens.[3]  Cruz's affidavit states that arrestees were given

wristbands with identifying numbers on them, and Cruz, Mendez, and Miranda recalled being

photographed, fingerprinted, or required to sign some sort of paperwork.  Hernandez, Mendez,

and Miranda were released after friends or acquaintances retrieved their immigration documents

from their homes and brought the documents to the plant.  Cruz was released after additional

questioning and after ICE agents apparently verified her claim to legal residency by using Cruz's

non-immigration identification documents and her social security number.  These four Plaintiffs

were detained for approximately two to five hours.

Plaintiffs filed this action on September 4, 2007.  Defendants moved for an order

requiring Plaintiffs to make a more definite statement of their claims and to file a reply to the

answer.  Plaintiffs objected, and, by order of the magistrate judge, the motion was denied.  The

case is now before the Court on Defendants' motion to dismiss or, in the alternative, for

summary judgment.

## II.        DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[3]         Miranda was eventually moved to a bus parked outside of the Worthington plant.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.** *Bivens* **claims against DHS, ICE, and individual Defendants in their official capacities**

Plaintiffs' claims for violations of their constitutional rights are by necessity brought pursuant to the doctrine first articulated in *Bivens v. Six Unknown Named Agents*. Under that doctrine, a plaintiff may bring a claim directly under the United States Constitution against a federal official for violations of constitutionally protected rights. *Buford v. Runyon*, 160 F.3d 1199, 1203 n.6 (8th Cir. 1998); *cf. Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) ("An action under Bivens is almost identical to an action under [42 U.S.C. § 1983]."). However, "[i]t is well settled that a *Bivens* action cannot be prosecuted against the United States and its agencies because of sovereign immunity." *Buford*, 160 F.3d at 1203. Accordingly, Plaintiffs' *Bivens* claims against DHS and ICE must be dismissed. Moreover, because claims against officials in their official capacities are treated as claims against the entity for which the officials work, *see id.*, Plaintiffs' *Bivens* claims against individual Defendants in their official capacities must be dismissed as well.

B.      **Fifth Amendment claims for violation of *Miranda* rights**

Plaintiffs claim that Defendants violated their Fifth Amendment rights when Defendants

denied them access to counsel and failed to inform them of their rights before subjecting them to

interrogation.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  A civil action for alleged

violations of *Miranda* rights, however, cannot be maintained.  *See Hannon v. Sanner*, 441 F.3d

635, 636 (8th Cir. 2006); *Brock v. Logan County Sheriff's Dep't*, 3 F.3d 1215, 1217 (8th Cir.

1993) (per curiam); *Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989) (en banc).

Accordingly, Plaintiffs' claims for violation of their *Miranda* rights must be dismissed.

C.      **Sixth Amendment claims**

Plaintiffs claim that Defendants violated the Sixth Amendment by denying Plaintiffs

access to counsel during the search of the Worthington plant.  The Sixth Amendment right to

counsel does not attach until criminal prosecution is commenced.  *Rothgery v. Gillespie County*,

128 S. Ct. 2578, 2592 (2008) ("[A] criminal defendant's initial appearance before a judicial

officer, where he learns the charge against him and his liberty is subject to restriction, marks the

start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to

counsel.").  Because the record clearly establishes that Plaintiffs' Sixth Amendment rights to

counsel had not attached at the time those rights were allegedly violated, that is, when Plaintiffs

were questioned and detained at the Worthington plant, Plaintiffs' claims for violation of those

rights must be dismissed.

D.      **Fourth Amendment claims**

Plaintiffs explicitly disclaim any intention to challenge the validity of the warrant to

search the Worthington plant.  Instead, Plaintiffs allege that Defendants acted outside the scope

of the search warrant and without sufficient additional cause when Defendants initially seized

Plaintiffs for questioning; when they subjected Barrera, Gomez, Mario Martinez, Paul Martinez, and Sagastume to limited detention subsequent to questioning; when they subjected Cruz, Hernandez, Mendez, and Miranda to full custodial arrest; and when they searched several Plaintiffs' lockers and personal possessions.  Plaintiffs further allege that the manner in which they were searched, seized, and questioned was constitutionally unreasonable.[4]

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  This right "is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer" and supported by probable cause.  *California v. Carney*, 471 U.S. 386, 390 (1985).  Unless an exception to this warrant requirement exists, a search must not exceed the scope of that authorized by the warrant, *Horton v. California*, 496 U.S. 128, 140 (1990), and a search is within the scope of a warrant if it is consistent with the warrant's parameters, *see Walden v. Carmack*, 156 F.3d 861, 873 (8th Cir. 1998); *cf. McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 517 (8th Cir. 2005) ("[O]fficers executing a search warrant are not obliged to interpret it narrowly." (quotation marks omitted)).  In addition, a search must be conducted in a reasonable manner, though officers executing a search warrant may generally choose from among multiple reasonable methods.  *Dalia v. United States*, 441 U.S. 238, 257 (1979).

Defendants argue that any searches and seizures were lawful or at least not so obviously unlawful as to deprive them of the protection of qualified immunity.  The doctrine of qualified immunity protects government actors performing discretionary functions from civil liability

---

[4]     To the extent that Plaintiffs allege that their Fifth Amendment rights were violated by any search or seizure, such claims are duplicative of Plaintiffs' Fourth Amendment claims.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (quotation marks omitted)).

when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As a result, even if Plaintiffs' rights have been violated, Defendants may still avoid liability on qualified immunity grounds. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-18 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (quotation marks omitted)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

For the reasons discussed below, the Court concludes that Plaintiffs are not entitled to recover for violation of their Fourth Amendment rights and that, on this matter, no genuine issue of material fact remains.

### 1. *Initial detention of all Plaintiffs for questioning*

The parties dispute not only whether any detention of Plaintiffs for questioning was constitutional but also the threshold issue of whether Plaintiffs were in fact seized for purposes of the Fourth Amendment when they were directed to the cafeteria and questioned. Assuming that Plaintiffs were seized when they were directed to the cafeteria and questioned there, the Court concludes that Defendants are entitled to qualified immunity regarding any such seizures.[5]

---

[5]      In arguing that the search of the Worthington plant was unreasonable and outside the scope of the warrant, Plaintiffs rely heavily on *I.N.S. v. Delgado*, 466 U.S. 210 (1984). In *Delgado*, immigration officials searched two factories pursuant to warrants showing probable cause to believe that numerous illegal aliens were employed there. 466 U.S. at 212. A third factory was searched with the employer's consent. *Id.* During the searches, agents were

First, because the warrant specifically authorized arrests of illegal aliens, the authority of Defendants to question Swift employees would have been necessarily implied even if the warrant had been silent on the matter.  *See Blackie's House of Beef, Inc., v. Castillo*, 659 F.2d 1211, 1226 (D.C. Cir. 1981) (stating that, in the course of executing a warrant authorizing search for illegal aliens, "some amount of questioning is always necessary").  In any event, the warrant explicitly authorized ICE agents to question Swift employees who may have been illegal aliens, stating:

> In making this search, the agents of ICE are authorized to enter any locked room on the premises in order to locate persons who may be such aliens in the United States without legal authority, and if any such persons are found on the premises, to exercise their authority pursuant to section 287 of the Immigration and Nationality Act, 8 U.S.C. § 1357, to question them to determine whether they are such aliens and, if there is probable cause to believe they are such aliens, to arrest them.

---

stationed near the buildings' exits while other agents traveled systematically through the factories to question most, but not all, of the employees at their work stations:

> The agents displayed badges, carried walkie-talkies, and were armed, although at no point during any of the surveys was a weapon ever drawn.  Moving systematically through the factory, the agents approached employees and, after identifying themselves, asked them from one to three questions relating to their citizenship.  If the employee gave a credible reply that he was a United States citizen, the questioning ended, and the agent moved on to another employee.  If the employee gave an unsatisfactory response or admitted that he was an alien, the employee was asked to produce his immigration papers.  During the survey, employees continued with their work and were free to walk around within the factory.

*Id*. at 212-13.  Four individuals who were questioned during the survey sued for alleged violations of their Fourth Amendment rights.  The Court held that, under the circumstances, questioning of the plaintiffs at their workstations did not constitute seizure within the meaning of the Fourth Amendment.  *Id.* at 218-21.  The Court declined to discuss the legality of questioning that is more "detentive."  *See id.* at 219.  Because the Court in *Delgado* held only that there was no seizure under the facts of that case, the *Delgado* opinion does not establish that any seizures of Plaintiffs in the present action violated clearly established law or that any such seizures were illegal.

Agents executing a warrant are entitled to take measures to ensure a safe and efficient search, including detention of persons present at the site of the search.[6] *See Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." (quotation marks omitted)); *Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (footnote omitted)). Here, Plaintiffs were directed to a central location for a short inquiry about their immigration statuses. The Court is satisfied that a reasonable official could have concluded that these actions were consistent with the parameters of the warrant and not otherwise unreasonable.

Second, even if the Court did conclude that questioning of Plaintiffs was outside of the scope of the warrant, Defendants would nevertheless have been permitted to briefly detain Plaintiffs for questioning if Defendants had reasonable suspicions that Plaintiffs were illegal aliens. *See* 8 U.S.C. § 1357(a)(1) (2006) (granting immigration officials the authority to, without a warrant, "interrogate any . . . person believed to be an alien as to his right to be or to remain in the United States"); 8 C.F.R. § 287.8(b)(2) (2008) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning."); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("[The Fourth Amendment] forbids stopping or

---

[6]     Plaintiffs state that the Worthington plant was searched pursuant to an administrative search warrant. Plaintiffs do not, however, argue that the power of law enforcement officers to detain individuals at the premises to be searched depends on whether the warrant is criminal or administrative in nature.

detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").  In this case, the affidavit in support of the warrant application states that ICE had received information from informants and other individuals indicating that Guatemalan, Honduran, El Salvadoran, and Mexican nationals were illegally employed at the Worthington plant, in many instances through fraudulent use of Puerto Rican birth certificates.  The affidavit further states that ICE agents had reviewed Swift's employment records and that this review indicated that approximately 800 of the 2,200 employees at the Worthington plant were potentially illegal aliens.[7]  With this evidence, a reasonable official could have concluded that reasonable grounds existed to suspect that Plaintiffs, all of whom are Latino and were working at the Worthington plant, were illegal aliens such that it would have been appropriate to question them in order to either confirm or dispel the suspicions.  *See* 8 U.S.C. § 1357(a)(1); 8 C.F.R. § 287.8; *cf. Brignoni-Ponce*, 422 U.S. at 886-87 (indicating that, while race may not be the only basis, race may be properly considered by an official in making the determination to stop an individual to inquire about his immigration status).  Accordingly, to the extent that Plaintiffs were seized for initial questioning, the Court concludes that Defendants are entitled to qualified immunity.

2. *Detention of Barrera, Gomez, Mario Martinez, Paul Martinez, and Sagastume subsequent to questioning*

The record indicates that, after they were questioned, Plaintiffs Barrera, Gomez, Mario Martinez, Paul Martinez, and Sagastume were temporarily detained without handcuffs along with other individuals of all races who were not suspected of being illegal aliens.  Under the circumstances of this case, a reasonable officer could have believed that such detentions were

---

[7]     The record suggests that approximately 230 to 250 individuals were actually arrested during the search.

necessary for safe and efficient execution of the warrant and therefore legal.  *See Mena*, 544 U.S. at 100 (holding that the Fourth Amendment was not violated when an occupant of a residence searched for weapons pursuant to a warrant was detained in handcuffs for two to three hours). Accordingly, the Court concludes that Defendants are entitled to qualified immunity as to the limited detention of these Plaintiffs.

>    3.   *Arrests of Cruz, Hernandez, Mendez, and Miranda*

The record establishes that, after questioning, Plaintiffs Cruz, Hernandez, Mendez, and Miranda were subjected to full custodial arrest.  *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (discussing "indicia of custody").  However, the record further establishes that these Plaintiffs revealed to ICE agents that they were legal residents who were not in possession of their "papers" or "documents."  Accordingly, ICE agents had probable cause to believe these Plaintiffs were violating 8 U.S.C. § 1304(e) (2006) (requiring an alien to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card"), a misdemeanor offense, and the arrests of these Plaintiffs did not violate the Fourth Amendment, *see Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008) (holding that an arrest is "constitutionally reasonable" "when an officer has probable cause to believe a person committed even a minor crime in his presence").

>    4.   *Search of Plaintiffs' lockers and personal belongings*

A subset of Plaintiffs complains that searches of their worksite lockers and personal effects violated their Fourth Amendment rights.  Defendants acted pursuant to a warrant that authorized ICE agents to:

>    enter the [Worthington plant] and to make such search as is necessary to locate aliens present in the United States illegally and counterfeit, altered, or imposter documents possessed and/or used by the aliens who are not lawfully entitled to

reside within the United States and who are employed at present within Swift, Inc.

The documents mentioned in the warrant could easily be concealed in a locker or among an individual's personal effects, and consequently the Court concludes that the searches of Plaintiffs' lockers and personal items fell within the scope of the search warrant. *See United States v. Khabeer*, 410 F.3d 477, 482 (8th Cir. 2005) (indicating that a search warrant authorizes searching officers "to search all areas in the residence that could conceal [items listed in the warrant]").

### 5. *Manner in which searches and seizures were conducted*

Plaintiffs assert that their Fourth Amendment rights were violated by the allegedly unreasonable manner in which they were searched and seized. *See Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (indicating that the manner in which a search or seizure is conducted comports with the Fourth Amendment if it is objectively reasonable under the totality of the circumstances). Specifically, all Plaintiffs claim that their rights were violated to the extent that they were subjected to persistent questioning, racial slurs, accusations of criminality, and generally rude treatment. The four Plaintiffs who were arrested further claim that their rights were violated insofar as they were forced to change out of their work clothes in the presence of ICE agents, required to keep the door open while using the bathroom,[8] refused additional opportunities to use the bathroom during their detentions, and denied food and water during their detentions. Finally, Plaintiff Cruz further alleges that her handcuffs were too tight, injuring her wrists and constituting use of excessive force in violation of the Fourth Amendment.

---

[8]     Cruz's affidavit indicates that she changed clothes and used the bathroom in the presence of a female ICE agent. Hernandez's affidavit indicates that he used the bathroom in the presence of a male ICE agent. There is no indication that any Plaintiff had to change clothes or use the bathroom in the presence of ICE agents of the opposite gender.

Use of a racial slur is reprehensible and cannot be condoned.  Use of a racial slur, however, does not in itself constitute a violation of the Fourth Amendment.  *See Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir. 1992) (affirming summary judgment in a section 1983 case where one defendant "uttered a racial slur, and threatened to 'knock [the plaintiff's] remaining teeth out of his mouth'"); *cf. Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) (declining to address whether use of racial epithets alone may constitute a Fourth Amendment violation).

Regarding injury to Cruz's wrists, Cruz contends that she could not return to work after being released by Defendants and that she experienced numbness in her hands through the date of her affidavit, January 11, 2007.  While Cruz claims to have photographs of her injuries, the record contains no such photographs, and Cruz apparently did not consult a doctor, though after being released she did visit the plant infirmary where a nurse iced Cruz's wrists for about 15 minutes.  The Court concludes that this evidence, at least without supplemental details regarding the severity and duration of her injuries, is insufficient to establish a claim for use of excessive force.  *See Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (noting absence of medical records and holding that "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury," are insufficient to establish a Fourth Amendment violation despite the plaintiff's claims that he suffered nerve damage).

Finally, given the large number of arrestees, Defendants' interest in maintaining order, the need to ensure the safety of both ICE agents and Swift workers, and the relatively limited duration of any detentions of Plaintiffs, the Court cannot conclude that the remaining actions of which Plaintiffs complain were so clearly unreasonable within the meaning of the Fourth Amendment as to preclude application of qualified immunity.  *See United States v. Oliver*, 363

F.3d 1061, 1067 (10th Cir. 2004) ("[P]rotection against rude, officious, or intrusive police questioning is not a core concern of [the Fourth] Amendment."); *Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002) ("[W]e cannot say in light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety."); *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000) ("We find no authority for the existence of a right on the part of one who is lawfully detained pursuant to the execution of a search warrant to use a toilet upon demand." (citation omitted)); *Martin v. Sargent*, 780 F.2d 1334, 1338-39 (8th Cir. 1985) (indicating that name-calling and verbal abuse are not constitutional violations). Accordingly, Plaintiffs fail to establish that Defendants may be held liable on the ground that the manner in which they conducted searches or seizures violated the Fourth Amendment.

**E.     Fifth Amendment claims for denial of equal protection**

Plaintiffs claim that their Fifth Amendment rights to equal protection were violated when they were allegedly subjected to questioning, detention, and abuse while their Caucasian co-workers were exempted from such treatment.[9]  Defendants argue, among other things, that Plaintiffs are unable to establish facts sufficient to support their claim.

The Constitution forbids the government from denying persons protection of the laws based on considerations such as race.[10]  *See* U.S. Const. amend. V; U.S. Const. amend. XIV, § 1;

---

[9]     While Plaintiffs' affidavits suggest that Defendants gave preferential treatment to workers who were fluent in English, Plaintiffs support their equal protection claims solely with arguments related to race-based discrimination.

[10]     The Fourteenth Amendment, which prohibits deprivation of "equal protection of the laws," applies only to the states and not to the federal government.  Although the Fifth Amendment contains no express equal protection guarantee, the Supreme Court has interpreted the Fifth Amendment as creating a right to equal protection against the federal government that

*Whren v. United States*, 517 U.S. 806, 813 (1996). To prevail on a claim that he was selectively

targeted for investigation or harassment in violation of his equal protection rights, a plaintiff

must show that the defendant's actions had a discriminatory effect and were motivated by a

discriminatory purpose. *See Jefferson v. City of Omaha Police Dep't*, 335 F.3d 804, 807 (8th

Cir. 2003) (discussing claim for selective prosecution); *cf. Flowers v. City of Minneapolis*, No.

07-2705, 2009 WL 635243, at *3 (8th Cir. Mar. 13, 2009) (assuming for the purposes of

argument that selective investigation and harassment violate the Constitution). To establish a

discriminatory effect in a case involving alleged racial discrimination, the plaintiff must show

that he was treated differently than similarly situated individuals of a different race. *United

States v. Armstrong*, 517 U.S. 456, 465 (1996); *cf. Estate of Bennett v. Wainwright*, 548 F.3d

155, 166 (1st Cir. 2008) (indicating that "similarly situated" means "roughly equivalent . . . in all

relevant respects" (quotation marks omitted)).

Plaintiffs contend that for purposes of executing the warrant they were similarly situated

to Swift's Caucasian employees. As discussed above, the affidavit in support of the warrant

indicates that Defendants had evidence that suggested that a large number of illegal aliens were

employed at the Worthington plant. This evidence further suggested that those suspected illegal

aliens were Latino. In circumstances such as this, the government may properly consider race as

a factor relevant to its decisions or actions. *See Brignoni-Ponce*, 422 U.S. at 886-87 (indicating

that, while race may not be the only basis, race may be properly considered by an official in

making the determination to stop an individual to inquire about his immigration status);

*Jefferson*, 335 F.3d at 807 (indicating that government actors may consider race as part of a

description of a criminal suspect); *Buffkins v. City of Omaha*, 922 F.2d 465, 468 (8th Cir. 1990)

---

is coextensive with the right to equal protection under the Fourteenth Amendment. *See Buckley
v. Valeo*, 424 U.S. 1, 93 (1976) (per curiam).

("[T]he officers' identification of [the plaintiff based in part on her race] was reasonable and nondiscriminatory in light of the fact that her race matched the racial description of the person described in the tip.").  Plaintiffs make no claim that any comparable reason existed for Defendants to suspect that a significant number of Swift's Caucasian employees were illegal aliens.  As a result, Plaintiffs cannot be considered similarly situated to Swift's Caucasian employees such that disparate treatment between the two groups will support an equal protection claim.  *Cf. Flowers*, 2009 WL 635243, at *3 (stating that "[l]aw enforcement's decision about whom to investigate and how . . . is ill-suited to judicial review" because "that decision may depend on the strength of the information provided, an agency's enforcement priorities, and how a particular investigation relates to an overall enforcement plan").  Furthermore, any differences in ways Defendants treated Latinos and their Caucasian co-workers appear to have largely corresponded to the ways in which the two groups were differently situated, as the affidavits of Gomez and Mario Martinez state that even Caucasian employees who were exempted from questioning were required to wait with other individuals who were not believed be illegal aliens.

Regarding Defendants' alleged use of a racial slur, use of racial slur may constitute evidence of discriminatory intent.  However, it is not enough, under these circumstances, to create a genuine issue of material fact regarding violation of Plaintiffs' equal protection rights.  *See Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("[A]n officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."); *Burton v. Livingston*, 791 F.2d 97, 101 n.1 (8th Cir. 1986) ("A simple allegation that an individual prison guard used racially offensive language in dealing with a prisoner might not, by itself, state a claim under the Equal Protection Clause."); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985) (indicating that equal

protection rights are not necessarily violated when injury is inflicted by a government defendant who happens to be prejudiced against members of the plaintiff's race). Accordingly, Defendants are entitled to summary judgment on Plaintiffs' equal protection claims.

**F.      Claims for violations of the Immigration and Nationality Act (INA)**

It is unclear which provisions of the INA are alleged by Plaintiffs to have been violated by Defendants,[11] and Plaintiffs fail to identify any authority indicating that the INA creates a private right of action under the circumstances of this case. *Cf. Arcoren v. Peters*, 829 F.2d 671, 676-77 (8th Cir. 1987) ("A *Bivens* action for damages . . . must be founded upon a violation of constitutional rights. A violation of a statute . . . does not rise to a constitutional level unless the statutory . . . provisions supply the basis for the claim of a constitutional right." (citations omitted)). Accordingly, the Court dismisses Plaintiffs' claims for violation of the INA.

**G.      Injunctive relief**

In their Complaint, Plaintiffs ask the Court to "[p]ermanently enjoin the defendants and each of them from continuing to engage in each violation of law the Court shall find." Defendants argue that, regardless of the merits of Plaintiffs' claims for past violations of their rights, Plaintiffs lack standing to seek injunctive relief. The Court agrees.

For Plaintiffs to have standing to seek an injunction, they must demonstrate a "realistic threat" that their constitutional rights will be violated in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983). Plaintiffs argue that they face a realistic threat of future harm because the search of the Worthington plant was part of a larger and ongoing immigration enforcement operation. However, even if it is assumed that the search of the Worthington plant

---

[11]      Plaintiffs may intend to allege a violation of 8 U.S.C. § 1357, which was referenced in the warrant authorizing search of the Worthington plant and addresses the permissible scope of warrantless searches and interrogations by ICE agents. No cause of action exists for violation of section 1357. *See Chairez v. U.S. I.N.S.*, 790 F.2d 544, 548 (6th Cir. 1986).

was part of an ongoing operation, it does not follow that the Worthington plant is likely be targeted in the future, that any future search of the Worthington plant is likely to be conducted in a manner that will violate Swift employees' constitutional rights, and that any future unconstitutional search of the Worthington plant is likely to affect Plaintiffs in particular.  As a result, the Court concludes that there is insufficient indication that Plaintiffs face a realistic threat of future harm.  *See id.* (indicating that the plaintiff lacked standing to seek an injunction where he did not demonstrate a sufficient likelihood that he would again be stopped by police and that he would again be subjected to an allegedly unconstitutional police policy regarding use of force); *Arias v. U.S. Immigration & Customs Enforcement Div. of Dep't of Homeland Sec.*, Civ. No. 07-1959, 2008 WL 1827604, at *11-12 (D. Minn. April 23, 2008) (concluding the plaintiffs lacked standing to seek an injunction where their constitutional rights were allegedly violated as a result of "an ongoing national initiative by ICE").

Moreover, any threat of future harm could not be adequately redressed by the injunction Plaintiffs seek.  Because the legality of Defendants' actions will likely depend on the specific circumstances with which they are confronted, the Court could do little more than order Defendants to refrain from breaking the law.  Such an injunction is not permitted and, furthermore, would be of little use in guiding Defendants' actions.  *See Elend v. Basham*, 471 F.3d 1199, 1209-10 (11th Cir. 2006); *Daniels v. Woodbury County*, 742 F.2d 1128, 1134 (8th Cir. 1984).  Accordingly, Plaintiffs' claims for injunctive relief must be dismissed.

## H.     Plaintiffs' request for discovery

Plaintiffs argue that, because discovery has yet to commence, summary judgment on any of their claims is inappropriate at this time.  *See* Fed. R. Civ. P. 56(f).  The Court disagrees.  "As a general rule, summary judgment is proper only after the nonmovant has had adequate time for

discovery." *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999) (quotation

marks omitted); *cf. Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 647 (8th Cir. 2001)

("[L]imited discovery may be required to resolve the qualified immunity question."). *But see*

*Krein v. Norris*, 250 F.3d 1184, 1188 (8th Cir. 2001) ("[Q]ualified immunity should be

determined at the earliest possible stage in litigation."). If the nonmovant demonstrates that

additional discovery would enable him to rebut the movant's showing of entitlement to summary

judgment, a court may, in its discretion, delay ruling on the motion. *See Janis v. Biesheuvel*, 428

F.3d 795, 801 (8th Cir. 2005); *Iverson*, 172 F.3d at 530 (indicating that a plaintiff need not be

permitted to "fish for a constitutional violation"); *Humphreys v. Roche Biomed. Labs., Inc.*, 990

F.2d 1078, 1081 (8th Cir. 1993) (stating that Rule 56(f) "is not a shield that can be raised to

block a motion for summary judgment without even the slightest showing by the opposing party

that his opposition is meritorious" (quotation marks omitted)). In this case, Plaintiffs fail to

adequately indicate how any of their claims would materially benefit from discovery.

　　　　Plaintiffs' Fourth Amendment claims fail because the circumstances of any searches and

seizures, as explained by Plaintiffs' own affidavits, do not establish any violations of their Fourth

Amendment rights that would entitle them to recovery. Plaintiffs do not specify how discovery

regarding their treatment at the hands of Defendants would be beneficial: Plaintiffs themselves

are well aware of the conduct that forms the basis of their Fourth Amendment claims. To the

extent that Plaintiffs seek discovery regarding Defendants' knowledge and beliefs, such

information is irrelevant because reasonableness, for purposes of the Fourth Amendment, is

judged by an objective standard. *See Whren*, 517 U.S. at 813; *cf. Wilson v. Northcutt*, 441 F.3d

586, 590 (8th Cir. 2006) ("A defendant's claim of qualified immunity is determined by an

objective standard."). The Court is satisfied that discovery on Plaintiffs' Fourth Amendment claims would be futile.

While Defendants' knowledge and beliefs would be relevant to the discriminatory intent element of Plaintiffs' equal protection claims, those claims fail on other grounds. As has been explained, the record does not support a conclusion that Plaintiffs were treated differently than similarly situated individuals of a different race. Plaintiffs' Rule 56(f) affidavit fails to indicate how additional discovery would enable them to establish that Caucasian workers at the Worthington plant were similarly situated to Plaintiffs, a state of affairs that appears extraordinarily unlikely given the undisputed evidence suggesting that a large number of Latino illegal aliens were working there. Any suggestion that discovery would uncover such information appears to be purely speculative. *Cf. Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999) (concluding that the district court did not abuse its discretion when it granted summary judgment where the nonmovant "speculat[ed] that more discovery would be useful" and "failed to show how the additional discovery would alter the evidence before the district court"). As a result, discovery on Plaintiffs' equal protection claims cannot be expected to be helpful.[12]

Plaintiffs' remaining claims are either legally deficient or fail on factual grounds that are not realistically subject to rebuttal through discovery. Because Plaintiffs fail to establish a sufficient likelihood that discovery would permit them to rebut Defendants' showing of entitlement to summary judgment, the Court concludes that it may grant summary judgment at this time.

---

[12] Plaintiffs make no broader claim about selective enforcement of immigration laws against Latinos on, for example, a national level. Even if Plaintiffs had made such a claim, there is no indication of how Plaintiffs might prove such a claim with additional discovery or of the likelihood of obtaining any evidence they might seek.

**III.      CONCLUSION**

There is no doubt that Defendants' actions in executing the warrant at the Worthington

plant were seriously distressing to Plaintiffs.  Plaintiffs are, after all, fully entitled to work in this

country.  Nevertheless, their claims cannot go forward.  The *Bivens* claims against DHS, ICE,

and the individual Defendants in their official capacities cannot be maintained.  As to the claims

against the individual Defendants in their personal capacities, they are—at the very least, under

the facts of this case—barred by qualified immunity.  Based on the files, records, and

proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      Defendants' motion to dismiss or, in the alternative, for summary
judgment [Docket No. 20] is GRANTED.

2.      Plaintiffs' Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 27, 2009

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge